[Cite as *State v. Lundy*, 2014-Ohio-5003.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

**STATE OF OHIO,**

    **PLAINTIFF-APPELLEE,**               **CASE NO. 1-13-52**

    **v.**

**MICHAEL LUNDY,**                    **O P I N I O N**

    **DEFENDANT-APPELLANT.**

**Appeal from Allen County Common Pleas Court**
**Trial Court No. CR20120236**

**Judgment Affirmed**

**Date of Decision:   November 10, 2014**

**APPEARANCES:**

    *F. Stephen Chamberlain* **for Appellant**

    *Terri L. Kohlrieser*  **for Appellee**

**WILLIAMOWSKI, P.J.**

{¶1} Defendant-appellant Michael Lundy ("Lundy") brings this appeal from the judgment of the Court of Common Pleas of Allen County finding him guilty of multiple charges and sentencing him to an aggregate prison sentence of forty years. Lundy challenges the sufficiency of the evidence supporting his conviction, the use of a peremptory challenge, and the sentence imposed. For the reasons set forth below, the judgment is affirmed.

{¶2} On August 16, 2012, the Allen County Grand Jury indicted Lundy on four counts: 1) Rape in violation of R.C. 2907.02(A)(2), a felony of the first degree; 2) Rape in violation of R.C. 2907.02(A)(2), a felony of the first degree; 3) Kidnapping in violation of R.C. 2905.01(A)(4), a felony of the first degree; and 4) Aggravated Burglary in violation of R.C. 2911.11(A)(1), a felony of the first degree. R. 3. A jury trial was held from August 6 to August 9, 2013. R. 208.

{¶3} The State's first witness was Albert Hammond ("Hammond") Hammond testified that he lived with his girlfriend, the victim, in Lima. Tr. 201. According to Hammond, he was sitting on the porch of their house when a man came up and started speaking to him. Tr. 212. Hammond did not know the man, but thought he might be a friend of the victim, so he continued to chat with him. Tr. 214. The man was wearing denim shorts and a white or cream colored shirt. Tr. 214. Hammond spoke to the man for approximately five minutes until the

victim returned. Tr. 214. When the victim returned, she went in the house to put the beer away and Hammond followed her. Tr. 215. At that point, they realized that neither of them knew this man. Tr. 215. When they went back out onto the porch, the man was standing on the porch. Tr. 215. Hammond told him to leave and the man started walking away. Tr. 216. Hammond followed him to the screen door, and the man turned around and struck Hammond. Tr. 216. Hammond testified that the man repeatedly struck him and Hammond fell to the ground. Tr. 217. Hammond could hear the victim on the porch telling the man to stop. Tr. 218. Soon after Hammond hit the ground, he lost consciousness. Tr. 218.

{¶4} When Hammond came to, he did not see the victim or the man. Tr. 218. Hammond then tried to go in the house, but the door was locked. Tr. 218. Hammond then went to the victim's mother's home and reported that the man had taken the victim. Tr. 218. An ambulance was called and Hammond went to the hospital while the victim's family went to find her. Tr. 219. Later, Hammond saw the victim at the hospital. Tr. 223.

{¶5} The next witness for the State was Mark Prinzi ("Prinzi"), who is related to the victim. Tr. 226. On the evening in question, he was in the house when there was a knock on the door. Tr. 231. When Prinzi opened the door, Hammond was standing there with blood running from his mouth and he appeared to be anxious. Tr. 232. When he learned that something had happened to the

victim, he called for his wife to care for Hammond and he went to find the victim. Tr. 232. When he got to the house, the door was locked. Tr. 232. His wife eventually joined him, they broke into the house, and searched the house for the victim, but she was not there. Tr. 233-34. They left the house and the victim's neighbor, Doug Moneer ("Moneer") came out. Tr. 234. Prinzi and Moneer then went looking down the street for the victim. Tr. 235. They proceeded to go towards the riverwalk. Tr. 238. Just when they were about to turn around and look in a different area, Moneer spotted the victim with a man, and Prinzi yelled her name. Tr. 240. The man pushed away from the victim then and took off running along the riverwalk. Tr. 240-41. The victim turned toward them and was pulling her pants up. Tr. 242. Prinzi testified that the victim did not look like herself because her face was swollen. Tr. 242. The person who ran away was a male, but Prinzi did not see his face. Tr. 243. When the victim got to them, she said that "he raped me" and Moneer then called 9-1-1. Tr. 243. The police and ambulance arrived soon after and the victim was taken to the hospital. Tr. 244-45. Once the victim was in the light, Prinzi saw that her "face was completely distorted, swelled out, her jaw was way out here, it just didn't look like her." Tr. 245.

{¶6} While the EMT's were treating the victim, Prinzi and Moneer were speaking with the police. Tr. 245. During the discussion, Moneer saw the man

-4-

that he identified as the attacker walking down the street and notified the police. Tr. 245. Prinzi described the man he saw with the victim as wearing a white tank-type T-shirt. Tr. 249.

{¶7} Moneer was the third witness for the State. Moneer testified that he lived next door to the victim and had known her for years. Tr. 261. On June 21, 2012, Moneer was in his house watching the final game of the NBA finals with his girlfriend and his children. Tr. 262. His girlfriend told him that she had seen the victim and a guy walking past the window towards the girlfriend's truck, so Moneer went to the door to see what was happening. Tr. 263. Moneer saw the victim leaning on the truck and an unknown black man was pulling her away. Tr. 264. He heard the victim say "Get away", but he thought she was drunk and he was just pulling her back to the party, so he went back in his house. Tr. 264. As the victim was walking away, Moneer's girlfriend told him that the victim's face was bleeding, so Moneer got back up and put on his shoes. Tr. 265. By the time he got back outside, Prinzi came running up looking for the victim. Tr. 267. Prinzi and Moneer then went to find the victim. Tr. 268.

{¶8} Moneer testified that he grabbed his big flashlight and he and Prinzi started walking towards the river. Tr. 268. After they had gone three-fourths of the distance, Prinzi wanted to turn around, but Moneer suggested they just go all the way down. Tr. 268. Moneer shined his light down by the bridge and saw two

people. Tr. 268. He recognized the woman as the victim and started running towards her. Tr. 269. As he got closer, he could see a man "raping her from behind." Tr. 269. When the man heard them coming, he pushed the victim away, picked up his shorts, and ran away. Tr. 270. The man ran towards Central Avenue along the riverwalk. Tr. 270. Once Prinzi and Moneer reached the victim, she kept repeating that the man had been raping her. Tr. 271. Moneer then called 9-1-1 and requested an ambulance and the police. Tr. 271. Moneer was able to give the officers a description of the man he saw. Tr. 272. While speaking to the officers, Moneer looked up at the people and saw the man he had previously seen. Tr. 273. He pointed him out to the police officer. Tr. 273. The officer then called for assistance in apprehending the man as he could not leave the scene. Tr. 276. Moneer testified that he identified the man because he was wearing the same pants, shirt, and shoes, and was the same height. Tr. 275. Moneer testified that he "just knew that's him." Tr. 275.

{¶9} On cross-examination, Moneer testified that he was able to recognize the victim immediately, but he did not know the man. Tr. 285. On redirect, Moneer identified the assailant's shorts as being black denim shorts. Tr. 293. The man was carrying a white shirt in his hand when he ran off. Tr. 293.

{¶10} Patrolman George Caldwell ("Caldwell") of the Lima Police Department was the fourth witness to testify for the State. Tr. 296. Caldwell

testified that on June 21, 2012, he was dispatched to the 200 block of South Jackson Street in reference to an assault. Tr. 297. He was dispatched at around 10:00 p.m. Tr. 297. When he arrived, the victim was sitting on the street being treated by the paramedics and a witness. Tr. 297. Caldwell testified that he took a statement from Moneer. Tr. 298. Moneer told him that the assailant was a black male who was wearing denim shorts and carrying a white t-shirt. Tr. 298. As Caldwell was speaking to Moneer, Moneer told him that he had just seen the man walking on Eureka Street after crossing Jackson Street. Tr. 299. Caldwell then radioed that a possible subject was heading east and provided a description of the clothing he was wearing. Tr. 300-301. The description of the clothing was provided to Caldwell by Moneer prior to Moneer seeing the man walking on Eureka Street. Tr. 301. Caldwell then learned that another patrolman had approached the defendant and he ran before being apprehended. Tr. 301. Caldwell did not go after the suspect, but instead went to the hospital with the victim. Tr. 301.

{¶11} At the hospital, Caldwell was able to get information from the victim, which he passed on to the detectives. Tr. 303. Caldwell also confiscated the victim's clothing and the linens from the ambulance as evidence. Tr. 303. Caldwell identified State's Exhibit 3 as the underwear taken from the victim. Tr. 305.

{¶12} The next witness for the State was Patrolman Shane Huber ("Huber") of the Lima Police Department. Tr. 310. On the night of June 21, 2012, Huber was assigned to street patrol. Tr. 311. On that night, Huber received a description of a suspect in a rape case. Tr. 312. The description of the suspect was that he was wearing shorts and carrying white t-shirt in his hands. Tr. 312. At the intersection of Pine and Eureka, Huber saw an individual that matched that description. Tr. 313. That individual was walking east when Huber saw him. Tr. 313. Huber then shined his spotlight on Lundy and told him to stop. Tr. 314. The individual then ran away by going through yards and attempting to evade capture. Tr. 314. Huber chased the man for three to four blocks before apprehending the man. Tr. 315. When Huber caught him, the man was carrying a white t-shirt and was wearing shorts. Tr. 316. The individual was transported to the station and his clothing was confiscated as potential evidence. Tr. 317. The individual was identified as Lundy. Tr. 313.

{¶13} Huber identified State's Exhibit 7 as a "white tank undershirt" taken from Lundy. Tr. 318. State's Exhibit 8 was identified as a pair of denim shorts also taken from Lundy. Tr. 318. State's Exhibit 9 was identified as a pair of Hanes striped boxer shorts taken from Lundy. Tr. 319. Huber also identified

State's Exhibit 11 as a white t-shirt that had been in Lundy's hands when he was apprehended.[1] Tr. 319.

{¶14} Patrolman Jason Warren ("Warren") of the Lima Police Department testified that he transported Lundy to the station after he was arrested by Huber. Tr. 330. When he arrived, Lundy was holding a white t-shirt in his hands. Tr. 33. The t-shirt was placed in a bag in the trunk of his cruiser. Tr. 330. Once he arrived at the station, the bag was turned over to Huber and Lundy was placed in a holding room. Tr. 331. While processing Lundy, Warren noted that the zipper on Lundy's shorts was down. Tr. 332.

{¶15} Patrolman Zack Leland ("Leland") of the Lima Police Department testified that he was working the desk when Lundy was at the station. Tr. 335. He was assigned to watch Lundy in the bathroom. Tr. 335. When he arrived in the restroom, Lundy was using wadded up toilet paper to rub his nose and face area. Tr. 337. After Lundy had finished using the restroom, he started washing his hands and face before Leland stopped him. Tr. 337. Leland documented that Lundy had been able to possibly destroy evidence in a report. Tr. 338.

{¶16} Officer Michael Carmen ("Carmen") was the eighth witness for the State. Carmen testified that he is an Identification Officer for the Lima Police Department. Tr. 346. On June 21, 2012, he received a call at approximately 10:15

---

[1] There were two different white shirts taken from Lundy.

to respond to a crime scene. Tr. 349. He went to the two hundred block of South Jackson near the riverwalk. Tr. 350. Carmen started processing the scene by taking photographs. Carmen testified that they found an open condom wrapper and a white towel with what appeared to be blood on it at the scene. Tr. 356. After processing the scene under the bridge, Carmen went up to the victim's home to process that scene. Tr. 359.

{¶17} Like the scene by the riverwalk, Carmen started processing the scene at the house by taking multiple photographs. Tr. 360. At the house, Carmen observed drops of blood on the metal black iron railing and on the cement. Tr. 362. Carmen noted that the window was no longer in place as it had been removed. Tr. 366. Carmen noted that there was a blood smear on the door frame leading into the kitchen. Tr. 367. While working the scene, Carmen's attention was brought to footprints in the alley behind the home. Tr. 371. Carmen took casts of the prints and compared them to Lundy's shoes, but they did not appear to match. Tr. 373.

{¶18} When Carmen returned to the station, he began processing evidence from Lundy. Tr. 374. Carmen took swabs from Lundy's penis, and the swabs were identified as State's Exhibit 1.1. Tr. 374-75. State's Exhibit 1.3 were swabs from Lundy's right hand and Exhibit 1.4 were swabs from Lundy's left hand. Tr.

377. State's Exhibit 1.5 was a buccal swab to obtain a DNA standard from Lundy. Tr. 377.

{¶19} The ninth witness for the State was the victim. The victim testified that on the night of June 21, 2012, she and Hammond were sitting on the front porch, listening to music, and drinking beer. Tr. 409. Around 9:00 p.m., the victim left with a relative to get more beer. Tr. 410. When she got back from the carryout, she walked from the relative's home to hers carrying the beer. Tr. 410. The victim saw a man standing on the front porch talking to Hammond, but she did not know the man. Tr. 411. The victim then went in the house to put the beer away and asked Hammond, who had followed her into the house, who the man was. Tr. 411. They realized that neither of them knew him. Tr. 411. They returned to the porch and continued talking, but the man started giving her odd looks. Tr. 411. Hammond then asked him to leave and a fight started. Tr. 412. The man punched Hammond while on the steps and the fight continued into the yard. Tr. 413. The victim kept telling the man to quit hitting Hammond. Tr. 413. The man then turned and started punching the victim in the face while she was outside. Tr. 413, 415. The victim identified the man who struck her and Hammond as Lundy. Tr. 414. The victim then tried to run away to a neighboring home when Lundy struck her again, grabbed her by the arm and started to drag her up the steps toward the house. Tr. 415. Lundy took her into the home, but when

he turned to lock the door, the victim ran towards the back door to try and escape. Tr. 415. The victim testified that she got as far as the neighbor's drive before Lundy grabbed her again and punched her a couple more times. Tr. 416.

{¶20} After Lundy caught the victim, he began dragging her toward the riverwalk. Tr. 416. The victim attempted to escape again, but was too disoriented from the blows to be successful. Tr. 416-17. Lundy then took her to beneath the railroad overpass on the riverwalk. Tr. 417. The victim testified that Lundy pulled down her pants and had intercourse with her. Tr. 418. When she started crying, Lundy threatened to strike her again and then forced her to engage in anal sex. Tr. 418. The victim testified that she then heard Prinzi calling her and saw the flashlight. Tr. 418. Lundy then pulled away from her and she started running towards Prinzi. Tr. 418. The victim testified that while Lundy was doing this, she was crying. Tr. 420. When Prinzi was coming towards her, Lundy took off running in the opposite direction. Tr. 421. The victim looked over and saw Prinzi and Moneer coming towards her, so she tried to pull up her pants and get to them. Tr. 422. The victim testified that she told them that Lundy had raped her. Tr. 422.

{¶21} After the ambulance and police arrived, the victim was taken to the hospital. Tr. 422. At the hospital, a sexual assault examination was completed and photographs were taken of the victim's injuries. Tr. 4287. The victim

identified State's Exhibits 39-47 as photographs of her taken that night. Tr. 429. The photographs showed the injuries to her head and face, the bruising to her hand, scratches on her arms and legs, and bruising on her legs. Tr. 429-32. Prior to the incident, the victim's body did not have those injuries. Tr. 432. The victim was discharged from the hospital and went to a relative's home. Tr. 433.

{¶22} At the relative's home, a police detective brought her a file with six different mug shots. Tr. 433. The victim testified that she identified the picture of Lundy as her attacker. Tr. 433. The victim testified that she was positive which person was the assailant as soon as the detective set the pictures down. Tr. 434.

{¶23} On cross-examination, the victim admitted that she had been drinking that evening. Tr. 435. She estimated that she had drank six beers and Hammond had drank approximately ten or eleven beers before she went to the carryout for more. Tr. 436. The victim was shown the photo line-up at around 4:00 a.m. Tr. 443. The victim admitted that she only looked at the photo line-up for around two seconds before identifying Lundy. Tr. 444. On redirect, the victim testified that she had gotten a good look at her assailant. Tr. 445.

{¶24} The next witness for the State was Detective Sean Neidemire ("Neidemire") of the Lima Police Department. Tr. 446. Soon after 10:00 p.m. Neidemire received a call to respond to the scene of a rape. Tr. 448-49. Before going to the scene, he went to the hospital, spoke to the victim, and took

photographs of injuries. Tr. 449. Neidemire then went to the scene and checked in with Carmen to see if he needed assistance. Tr. 451. No assistance was needed, so he did not assist in gathering evidence. Tr. 451. Neidemire then returned to the police station and assembled a photo line-up. Tr. 451. Neidemire identified State's Exhibit 71 as the photo line-up that he prepared. Tr. 452. Neidemire then testified to the procedure he used to make the line-up. Tr. 452-53. At around 2:45 a.m., Neidemire went to see the victim and showed her the photo line-up he had prepared. Tr. 456-57. After he told the victim that the suspect may or may not be in the photos, he set the line-up down on the table. Tr. 457. The victim then pointed to the photo of Lundy and said "That's him, that's the man who assaulted me and that's the man that raped me." Tr. 457. There was no hesitation on the part of the victim in identifying Lundy as the assailant. Tr. 457. The photo identified was a photo of Lundy. Tr. 458. Prior to showing the victim the line-up, Neidemire did not tell the victim anything about the suspect or even that they had one. Tr. 459.

{¶25} Christina Umfleet ("Umfleet") testified that she is a registered nurse at Lima Memorial Hospital and works in the emergency room. Tr. 485-86. The victim was brought into the emergency room by the paramedics for an alleged assault. Tr. 487. When the victim arrived, Umfleet noticed that her face was "swollen, bruised, and bloody, kind of unrecognizable to be a normal person by

her face." Tr. 488. The victim was able to communicate, but her face and jaw were so swollen that she could barely open her mouth. Tr. 488. When questioned, the victim indicated that she had been sexually assaulted. Tr. 490. Umfleet testified that although she is not a certified Sexual Assault Nurse Examiner, there was not one on duty at the time, so she did the exam and followed the instructions on the rape kit. Tr. 493-94. Umfleet testified that she completed every step that pertained to the victim. Tr. 499. When Umfleet questioned the victim, the victim told her that there had been vaginal and anal penetration by the suspect's penis. Tr. 500-501.

{¶26} The next witness was Detective Scott Leland ("Det. Leland") of the Lima Police Department. Tr. 515. Det. Leland testified that he was called at home to help investigate a crime at approximately 10:00 p.m. on June 21, 2012. Tr. 516. After learning the basics of what had happened while at the station, Det. Leland went to the hospital to speak with the victim and Hammond. Tr. 518. Det. Leland spoke with Hammond first, who appeared intoxicated, but was also bloody and "pretty beat up." Tr. 519. Hammond was very upset that he had not been able to protect the victim. Tr. 519. Then Det. Leland spoke to the victim, who was "banged up" and appeared to be in pain. Tr. 520. The victim told him that she did not know her assailant. Tr. 520. She was able to give him a basic overview of what had happened, including that she had been physically assaulted, dragged into

the house, dragged down to the riverwalk, and sexually assaulted both vaginally and rectally.  Tr. 521.

{¶27} From the hospital, Det. Leland went to the riverwalk and the house to get a view of the scene.  Tr. 521.  He testified that he did not touch anything at the scenes and did not spend much time there.  Tr. 522.  While walking the crime scene, it occurred to him that a new shift had come on and he wanted to make sure that they were aware that Lundy could not be given the ability to "wash up."  Tr. 523.  He called the station to tell them, but learned it was too late.  Tr. 523.

{¶28} Back at the station, Det. Leland prepared an affidavit for a search warrant of Lundy's person.  Tr. 523.  The warrant was issued by a judge the morning of June 22, 2012.  Tr. 527.  At that time, Carmen obtained the evidentiary samples from Lundy.  Tr. 527.  Det. Leland testified that numerous pieces of evidence were submitted to the Ohio Bureau of Criminal Identification and Investigation ("BCII") for tests for blood and DNA analysis.  Tr. 532-34.

{¶29} Julie Cox ("Cox") is a forensic scientist at BCII and is assigned to the forensic biology unit.  Tr. 562.  She examines evidence submitted for the presence of bodily fluids, such as blood, semen, and saliva.  Tr. 563.  Cox identified State's Exhibit 63 as her report dated June 29, 2012.  Tr. 567.  Cox testified there was no blood on the penile swabs or right hand swabs taken from Lundy, but there was blood present on the left hand swab.  Tr. 571-76.  The swabs

indicated that no semen was present on the vaginal or anal swabs of the victim. Tr. 578-79. An examination of the victim's underwear was also negative for the presence of semen. Tr. 584.

{¶30} Cox also identified State's Exhibit 65 as her report from September 14, 2012. Tr. 586. For this report, Cox was asked to examine a small towel or washcloth, a shirt from Lundy, and shorts from Lundy for the presence of blood. Tr. 586. All three of the items tested positive for the presence of blood. Tr. 589, 592, and 593. Cox then took samples and sent them for DNA testing. Tr. 594.

{¶31} The third report completed by Cox was done on October 1, 2012, and identified as State's Exhibit 66. Tr. 597. The item examined for blood in this report was Lundy's boxer shorts. Tr. 597. The boxer shorts tested positive for blood in the fly area. Tr. 598-99. The stain was submitted for DNA testing. Tr. 599. On cross-examination, Cox admitted that she did not test every piece of evidence. Tr. 606, 612.

{¶32} The final witness for the state was Sarah Smith ("Smith"), a forensic scientist for BCII in the DNA section. Tr. 632. Smith identified State's Exhibits 64 and 67 as her reports. Tr. 644. The date on State's Exhibit 64 was August 29, 2012. Tr. 644. The date on State's Exhibit 67 as November 1, 2012. Tr. 645. State's Exhibit 64 was the results of DNA testing of the swabs from Lundy, the rape kit of the victim, and DNA standards from Lundy, the victim, and Hammond.

Ex. 64. The results indicated that the DNA profile from the penile swabs was a mixture consistent with contributions from Lundy and the victim. Tr. 646. The statistical weight was that there was a 1 in 12,610 chance that the DNA found came from the victim and Lundy. Tr. 649.

{¶33} Smith's report labeled State's Exhibit 67 analyzed DNA samples from the rape kit of Lundy, the rape kit of the victim, the cloth found on the riverwalk, the shirt taken from Lundy, the shorts taken from Lundy, and the underwear taken from Lundy. Ex. 67. Smith testified that the blood stain on the cloth came from the victim. Tr. 655. The expected frequency occurrence of the DNA profile coming from someone other than the victim was one in four hundred sixty-two quintillion, five hundred quadrillion (462,500,000,000,000,000,000). Tr. 655. The blood stains from the shirt were consistent with the DNA profile of Hammond as well as Lundy. Tr. 657-58. The odds of those blood stains coming from anyone other than Hammond and Lundy were one in sixteen quintillion, seven hundred-thirty quadrillion (16,730,000,000,000,000,000). Tr. 658. Smith testified that the population of the world is approximately seven billion, so she would not expect to see the profile she found in another individual. Tr. 659. The test results for the swabs taken from the outside of the shorts indicated that a DNA mixture was found belonging to Lundy and the victim. Tr. 660-61. The likelihood that the mixture came from anyone other than Lundy and the victim

was one in thirty-one million, eight hundred eighty thousand (31,880,000). Smith also tested the DNA swabs from Lundy's underwear. Tr. 662-63. The tests revealed a mixture consistent with Lundy and the victim being the source. Tr. 663. The statistical weight of this test was one in two thousand, three hundred and fifty-seven (2,357). Tr. 663.

{¶34} The State then questioned Smith concerning the reports from Lundy's independent DNA examination of the samples. Tr. 665-78. Smith had prepared a report comparing the test results from BCII to those from the DNA Diagnostics Center ("DDC") and it was identified as State's Exhibit 69. Tr. 679. The chart was a summary of the results. Tr. 680. DDC's report could not exclude the victim as a source of the DNA found on the penile swabs. Tr. 681-82. Smith testified that although her tests excluded the victim and Hammond as sources of DNA on the swab from Lundy's left hand, the DDC tests did not exclude the victim as a source. Tr. 685. Additionally, the statistical weights to be assigned to the tests were different in various tests. Tr. 686. In general, the report from DDC was not inconsistent with that of BCII. Tr. 686.

{¶35} On cross-examination, Smith testified that the higher the statistical weight, the higher the confidence in the conclusion is. Tr. 692. The statistics mean nothing other than the level of confidence in the result. Tr. 699. Smith also testified that she did not know what equipment DDC was using for testing. Tr.

697. She also testified that she did not know the quality of the samples tested by DDC. Tr. 697-98. Smith explained on redirect that the results may depend on where the swab was taken from the sample as not every portion of a sample will have the same amount of DNA. Tr. 703. Following this testimony, the State rested its case. Tr. 707.

{¶36} Lundy presented the testimony of one witness during his case-in-chief. Stacy Martin ("Martin"), who works for DDC. Tr. 714. Martin identified State's Exhibits 68 and 68a as reports that she prepared and that they were dated August 8, 2013. Tr. 718. Martin testified that 68a was a supplement to 68 because some of the statistical results were changed as a result of clerical error. Tr. 719-21. Martin testified that she was hired by Lundy to conduct independent DNA testing on various items also tested by BCII. Tr. 722. Tests were run on the penile swab, Lundy's left hand swab, two stains from Lundy's shorts, one stain from Lundy's underwear, and the three reference standards. Tr. 723. As for the penile swab, the testing revealed that for the non-sperm fraction of the DNA, Martin identified a mixed profile from which Lundy, the victim and a third party could not be excluded. Tr. 725. The statistical weight given to this conclusion was one in ninety-seven (97). Tr. 725. Martin testified that this number was not very high. Tr. 725.

{¶37} Next, Martin tested the samples taken from the left hand swab of Lundy. Tr. 725-26. The test results indicated that DNA consistent with that of Lundy as the major contributor and the victim as a minor contributor was present. Tr. 726-27. The statistical weight given to the possibility of someone other than the victim being a minor contributor was put at one in twenty-one (21) individuals. Tr. 727.

{¶38} The third item tested by DDC was two stain samples from Lundy's shorts. Tr. 727. A review of the non-sperm faction of the stains indicated that two or more individuals contributed DNA to the sample. Tr. 728. Martin testified that Lundy and the victim could not be excluded as contributors. Tr. 728-29. The statistical probability of other individuals contributing was placed at one in one hundred and seventy thousand (170,000). Tr. 729. According to Martin, this does not rise to the level of "scientific reasonable certainty" because to reach that level "you'd have to exceed the population of the earth, which is approximately seven billion." Tr. 729. The second stain was also tested. Tr. 729. In the non-sperm fraction of the stain, the tests revealed a mixture of three or more contributors. Tr. 730. Lundy and the victim could not be excluded as contributors to the mixture. Tr. 730. The statistical probability of a random person being a contributor was "approximately one in forty-four" (44) individuals. Tr. 730.

{¶39} The last item tested by Martin was a stain from Lundy's underwear. Tr. 731. The non-sperm fraction again showed a mixture of three or more individuals. Tr. 731. Lundy and the victim could not be excluded as contributors. Tr. 731. The statistical weight assigned was one in two hundred and sixty (260) individuals. Martin testified that this is a very low level of confidence. Tr. 731. Martin also testified that although her statistics differed from those of BCII, the results were consistent. Tr. 734. Martin's conclusion was that she could not say with scientific certainty that the victim was a contributor to the DNA mixture found on the underwear. Tr. 736-37. Martin also testified that any probability below one in seven billion was not scientifically certain. Tr. 737.

{¶40} On cross-examination, Martin testified that she had reviewed BCII's results. Tr. 767. After reviewing BCII's reports, Martin had no reason to believe that BCII's results were incorrect. Tr. 767-68. Martin agreed that although the statistical weight may be different, the conclusion whether to exclude or not was the same. Tr. 768. Following this testimony, Lundy rested.

{¶41} The jury returned guilty verdicts on all four charges. R. 204-208. The trial court entered a judgment accepting the verdicts on August 9, 2013. R. 208. On September 9, 2013, a sentencing hearing was held. R. 217. The trial court found that none of the convictions merged. *Id*. The trial court then imposed a sentence of eleven years in prison for each of the rape convictions and nine years

in prison each for the kidnapping and aggravated burglary convictions. *Id.* The sentences were ordered to be served consecutively. *Id.* Lundy filed his notice of appeal on October 8, 2013. R. 219. On appeal, Lundy raises the following assignments of error.

### First Assignment of Error

**The trial court committed error in not merging the offenses of two counts of rape, aggravated burglary and kidnapping.**

### Second Assignment of Error

**The trial court committed error in not granting [Lundy's] challenge to the preemptory strike of an African American female from the jury.**

### Third Assignment of Error

**[Lundy's] convictions were against the manifest weight of the evidence and based upon insufficient evidence.**

### Fourth Assignment of Error

**[Lundy's] sentence is contrary to law.**

### Fifth Assignment of Error

**[Lundy] received ineffective assistance of counsel.**

In the interest of clarity, the assignments of error will be taken out of order.

{¶42} In the second assignment of error, Lundy claims that the trial court erred in allowing the State to use a preemptory challenge to remove an African-American from the jury in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct.

1712, 90 L.Ed.2d 69.  In *Batson*, the U.S. Supreme Court held that African-American defendants are denied equal protection under the law when they are tried before a jury from which other African-Americans have been purposely excluded.  *Id.*  "Although a prosecutor ordinarily is entitled to exercise permitted peremptory challenges 'for any reason at all, as long as that reason is related to his view concerning the outcome' of the case to be tried, United States v. Robinson, * * * the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." *Id*. at 90.

> " 'A court adjudicates a Batson claim in three steps.' " *State v. Bryan*, **101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 106, quoting** *State v. Murphy* **(2001), 91 Ohio St.3d 516, 528, 747 N.E.2d 765. "First, the opponent of the peremptory challenge must make a prima facie case of racial discrimination. Second, if the trial court finds this requirement fulfilled, the proponent of the challenge must provide a racially neutral explanation for the challenge.** *Batson*, **476 U.S. at 96–98, 106 S.Ct. 1712, 90 L.Ed.2d 69." Id. Third, the trial court must decide, based on all the circumstances, whether the opponent has proved purposeful racial discrimination.** *Batson* **at 98, 106 S.Ct. 1712, 90 L.Ed.2d 69.**

*State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 64.  A determination by the trial court that there is no discriminatory intent by the State will not be reversed absent an abuse of discretion.  *Id*.

> **In step three, the trial court may not simply accept a proffered race-neutral reason at face value, but must examine the prosecutor's challenges in context to ensure that the reason is not merely pretextual. "[T]he rule in Batson provides an opportunity to the prosecutor to give the reason for striking the juror, and it requires the judge to assess the plausibility of that reason in light of all evidence with a bearing on it." *Miller–El v. Dretke* (2005), 545 U.S. 231, 251–252, 125 S.Ct. 2317, 162 L.Ed.2d 196. If the trial court determines that the proffered reason is merely pretextual and that a racial motive is in fact behind the challenge, the juror may not be excluded. Id. at 252, 125 S.Ct. 2317, 162 L.Ed.2d 196.**

*Id.* at ¶65.

{¶43} During the voir dire of this case, the State used a preemptory challenge to remove an African-American juror from the jury, leaving the jury with no African-American members. Counsel for Lundy objected claiming a violation of his right to be tried by a jury of his peers pursuant to *Batson*. Counsel pointed out that the only other potential African-American juror was "well down the list." Tr. 138. The State presented the following race-neutral reason.

> **[S]ome of the family members that the uh, the juror listed, including - - in particular uh, her children's last name is Harmon and her son's name is [A.H.], Junior, who in speaking with Detective Leland and Miss Emerick, our office has prosecuted Mr. Harmon [Sr.] on a number of occasions. He's got many, many criminal things in his past; not to say that she does, but that causes us serious concern about whether she would be fair and impartial from [our] standpoint. Nothing as far as challenging for cause.**
>
> **But also again, the name Brownlow, there are a number of Brownlows uh, that the State has prosecuted in the past. I'm sure the Court's aware, particularly Easter Brownlow and**

-25-

> **Cornelius Brownlow. Again, not necessarily as an indication on the record that she is related to them, but not trying to take that chance, and certainly not wanting to point it out to her uh, embarrass her or anything like that. The State, quite frankly, just doesn't feel comfortable having her as a juror. And it has nothing to do with her race, but her associates.**

Tr. 140. The trial court then made a determination that there was no pattern of discrimination as required by *Batson* to shift the burden of proof to the State. Tr. 143. However, the trial court continued and found that even if the burden had shifted to the State, the State had put forth a race neutral reason for the challenge. Tr. 143. The trial court then overruled the challenge. A review of the record indicates that the State did provide a logical, race-neutral reason for the challenge. Thus, we cannot conclude that the trial court's ruling was an abuse of discretion. The second assignment of error is overruled.

{¶44} In the third assignment of error, Lundy claims that the verdicts of the trial court were not supported by sufficient evidence and were against the manifest weight of the evidence.

> **Every criminal prosecution requires proof that the person accused of the crime is the person who committed the crime. This truism is reflected in the state's constitutional burden to prove the guilt of "the accused" beyond a reasonable doubt. * * * Like any fact, the state can prove the identity of the accused by "circumstantial or direct" evidence. * * * The relevant question in a sufficiency-of-the-evidence review is whether, "after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."**

*State v. Tate*, ___ Ohio St.3d ___, 2014-Ohio-3667, ___ N.E.2d ___, ¶ 15 (citations omitted).

{¶45} In this case, Lundy was charged with four counts – two counts of rape, one count of kidnapping, and one count of aggravated burglary. To prove the two counts of rape, the State was required to prove that Lundy engaged in sexual conduct with the victim by force or threat of force. R.C. 2907.02(A)(2). The definition for sexual conduct includes vaginal intercourse and anal intercourse. R.C. 2907.01(A). The testimony at trial by the victim was that Lundy struck her several times, then forced her to go to a secluded location. Lundy threatened to strike her again if she fought. At that location, he pulled down her pants and penetrated her both vaginally and anally with his penis. The victim identified Lundy both outside of court and in court as her assailant. Both Moneer and Prinzi testified that they saw a man forcing the victim to engage in anal intercourse and that when he saw them, he took off running. The pictures of the victim submitted to the jury showed the injuries to the victim's body caused by Lundy using physical force against her. DNA testing revealed mixed DNA from penile swabs taken from Lundy and stains from Lundy's underwear. The tests could not exclude Lundy and the victim as the source of the mixed DNA. Viewing this testimony in a light most favorable to the State, a reasonable juror could conclude that Lundy had engaged in sexual conduct with the victim and that

he did so by means of force or the threat of force. Thus, the rape convictions are supported by sufficient evidence.

{¶46} The third count of the indictment charged Lundy with kidnapping. To prove the kidnapping charge, the State was required to prove that Lundy by force, threat, or deception removed the victim from one place or restrained the victim's liberty for the purpose of engaging in sexual activity with the victim. R.C. 2905.01(A)(4). The victim testified that Lundy struck her repeatedly and that when she tried to run away, he dragged her into her home and locked the door. She ran away again, only to be caught and struck again. Lundy then grabbed her arm and forced her to walk to a secluded location. At that location, Lundy held her and engaged in sexual conduct with her. The witness testified that she tried to get away, but she could not do so. The victim also testified that Lundy told her as he was hitting her that she "should have gave up the pussy in the first place, then none of that would have happened." Tr. 416. The victim stated that while Lundy was engaged in sexual conduct, she was crying and he threatened to strike her again if she did not stop. Tr. 418. Moneer testified that he heard the victim tell Lundy to let her go, but he dragged her away. Viewing this evidence in a light most favorable to the State, a reasonable juror could conclude that Lundy forced the victim into her home so that he could engage in sexual activity with her, but when she got away, he then forced her to go to a secluded location so that he could

-28-

engage in sexual activity with her. A reasonable juror could also conclude that the victim only went with Lundy because he used force and threatened to use more force if she did not comply. The conviction for kidnapping was supported by sufficient evidence.

{¶47} Finally, Lundy was charged with one count of aggravated burglary. To prove this charge, the State was required to prove that Lundy entered the victim's house by force with the purpose to commit a criminal offense and that he inflicted and threatened to inflict physical harm on another. R.C. 2911.11(A)(1). The testimony of Hammond was that Lundy struck him repeatedly until he passed out. At that point, Lundy turned and started striking the victim. When she tried to escape, he grabbed her and forced her into the home, where he turned and locked the front door. Prinzi testified that when he went to the house, the front door was locked and he had to break into the house by removing a window. Based upon Lundy's prior use of force against Hammond and the victim, and the fact that when the victim tried to run away, Lundy stopped her and forced her into the home, a reasonable juror could conclude that when Lundy entered the house and turned to lock the door, he did so with the purpose of committing a criminal offense. This inference is further supported by the subsequent actions of Lundy against the victim. Given this evidence and viewing it in a light most favorable to

the state, the evidence was sufficient to support a conviction for aggravated burglary.

{¶48} Lundy also claims that the convictions were not supported by the manifest weight of the evidence. Unlike sufficiency of the evidence, the question of manifest weight of the evidence does not view the evidence in a light most favorable to the prosecution.

> **Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief."**

*State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997) (citing Black's Law Dictionary (6 Ed.1990) 1594). A new trial should be granted only in the exceptional case in which the evidence weighs heavily against conviction. Id. Although the appellate court acts as a thirteenth juror, it still must give due deference to the findings made by the jury.

> **The fact-finder, being the jury, occupies a superior position in determining credibility. The fact-finder can hear and see as well as observe the body language, evaluate voice inflections, observe hand gestures, perceive the interplay between the witness and the examiner, and watch the witness' reaction to exhibits and the like. Determining credibility from a sterile transcript is a Herculean endeavor. A reviewing court must, therefore, accord**

> **due deference to the credibility determinations made by the fact-finder.**

*State v. Thompson*, 127 Ohio App.3d 511, 529, 713 N.E.2d 456 (8th Dist. 1998).

{¶49} As discussed above, the rape charges were supported by the testimony of the victim, the DNA results which indicates that the victim's DNA was found on Lundy's penis, the DNA results which indicate that Hammond's blood was found on Lundy's clothes,[2] the testimony of Prinzi and Moneer about what they saw, and the photographs of the injuries to the victim and to Hammond. Although Lundy presented evidence that the statistical weight of the DNA findings were low, even his own expert's testing indicated that the victim could not be excluded as one of the sources in the mixture of DNA found not only on Lundy's underwear, but on his penis as well. Given the evidence in this case, this court does not find that the evidence weighs heavily against conviction on the two rape charges.

{¶50} Similarly, the kidnapping charge is also supported by the evidence. The victim testified to two separate instances when Lundy forced her to go with him. One of these instances was witnessed by Moneer as well. The victim testified that as Lundy was walking her to the riverwalk, he basically told her he was going to sexually assault her, thus establishing his intent in moving her to a

---

[2] Although this does not show that a rape occurred, it supports the version of events told by Hammond and the victim, and indicates that Lundy was indeed the person who engaged in a physical altercation with Hammond, thus helping establish identity.

secluded location. Prinzi was able to testify to the fact that the front door was locked, although normally the victim did not lock it if she was home, which supported the testimony of the victim. Hammond testified to Lundy assaulting him and knocking him unconscious. The victim was found with Lundy, who took off running when Prinzi and Moneer came near, and the victim ran to them crying that she had been raped. All of this evidence along with the obvious signs of physical force that had been used on the victim supports the conviction for kidnapping. Thus, the conviction is not against the manifest weight of the evidence.

{¶51} Finally, Lundy was convicted of aggravated burglary. As discussed above, there was evidence that Lundy trespassed into the home by force, i.e. dragging the victim after striking her several times and knocking out the other resident of the home. Lundy then took the time to lock the door to keep others out, indicating that he intended to commit some act for which he wanted privacy. Although Lundy was not successful at engaging in sexual activity in the home due to the victim's escape, the events which followed are evidence of what his intent was. Viewing the evidence in total, this court does not find that the evidence weighs heavily against conviction on the charge of aggravated burglary. For the reasons set forth above, the convictions are not against the sufficiency of the

evidence or against the manifest weight of the evidence. The third assignment of error is overruled.

{¶52} The first and fourth assignments of error both have to do with the sentence imposed on Lundy by the trial court. In the first assignment of error, Lundy claims that his convictions should all have merged as allied offenses of similar import. The premier case on the current state of law in Ohio as it relates to merger of allied offenses is *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061. In *Johnson*, the defendant was convicted of felony murder and child endangering due to the death of a child in her custody during daycare. The Ohio Supreme Court reviewed the situation and set forth a new test for determining whether offenses were allied offenses of similar import.

> **Under R.C. 2941.25, the court must determine prior to sentencing whether the offenses were committed by the same conduct. Thus, the court need not perform any hypothetical or abstract comparison of the offenses at issue in order to conclude that the offenses are subject to merger.**
>
> **In determining whether offenses are allied offenses of similar import under R.C. 2941.25(A), the question is whether it is possible to commit one offense *and* commit the other with the same conduct, not whether it is possible to commit one *without* committing the other. *Blankenship,* 38 Ohio St.3d at 119, 526 N.E.2d 815 (Whiteside, J., concurring) ("It is not necessary that both crimes are always committed by the same conduct but, rather, it is sufficient if both offenses *can be* committed by the same conduct. It is a matter of possibility, rather than certainty, that the same conduct will constitute commission of both offenses." [Emphasis sic]). If the offenses correspond to such a degree that the conduct of the defendant constituting**

> **commission of one offense constitutes commission of the other, then the offenses are of similar import.**
>
> **If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., "a single act, committed with a single state of mind." * * ***
>
> **If the answer to both questions is yes, then the offenses are allied offenses of similar import and will be merged.**
>
> **Conversely, if the court determines that the commission of one offense will *never* result in the commission of the other, or if the offenses are committed separately, or if the defendant has separate animus for each offense, then, according to R.C. 2941.25(B), the offenses will not merge.**

*Id.* at ¶ 47-51. Thus, the first step this court must take is to determine if breaking and entering and attempted theft of a firearm can both be committed by the same act.

{¶53} In this case, the State conceded the first part of the test, that it is possible to complete each of these offenses with the same act. Thus, we will not address the first portion of the test. This leaves us with one question: In this case, were all four charges completed with the same conduct and with the same animus? The answer to this question is no.

{¶54} The first two counts of the indictment were for rape. One of the charges was for an instance of vaginal intercourse and the other was for an instance of anal intercourse. According to the victim, Lundy first penetrated her vaginally with his penis. When he was done, he told her he was going to rape her

anally. He then penetrated her anally with his penis. Since these were two separate acts with separate animus, they are not allied offenses of similar import in this case. Thus, the trial court correctly determined that these charges should not merge with each other.

{¶55} The third count of the indictment was a kidnapping charge where Lundy moved the victim by force or threat of force from one location to another for the purpose of engaging in sexual conduct. The evidence in this case indicated that after striking the victim multiple times with his fist, Lundy forced the victim to go into the home. When she escaped, he caught her in Moneer's driveway, struck her again with his fists, and then forced her to walk to a secluded location where he raped her twice. This is not a case where the kidnapping charge stems from the restraint of the victim during the rape. The evidence in this case indicates that Lundy forced the victim from one location to another with the intent to commit a sexual assault. They were separate acts and had separate animus. Therefore, the kidnapping charge does not merge with the rapes.

{¶56} Finally, we address the aggravated burglary charge. This offense occurred when Lundy forced his way into the home with the intent to commit a criminal offense. Clearly, this offense was not done at the same time as the two rapes, which occurred on the riverwalk. They were separate and distinct in time and space, and thus were not conducted by the same act and animus. Thus, it does

not merge with the rapes. As to the kidnapping charge, the aggravated burglary could be the same act as the kidnapping charge, but it is not necessarily so in this case. If Lundy was charged with kidnapping for forcing the victim into the house with the intent of sexual assault, that may also be an aggravated burglary. However, there are two separate and distinct instance of kidnapping aside from the entry into the home: 1) When Lundy prevented the victim from running to her mother's home and 2) When Lundy forced the victim from Moneer's driveway down to the riverwalk. The jury was not instructed as to which act was the basis of the charges, though multiple instances of attempted escape which were thwarted by Lundy were cited during the State's closing arguments. Without any clear indication that the kidnapping was also the trespass into the house, the jury might just have likely based its kidnapping verdict upon when Lundy prevented the victim from running away before forcing her into the home or when he forced her to leave Moneer's driveway and walk down to the secluded spot on the riverwalk where he raped her. Either one of these two instances would meet the necessary elements to convict Lundy of kidnapping.[3] Thus, the record does not clearly indicate that the kidnapping charge is based upon the same conduct as the aggravated burglary charge.

---

[3] The fact that Lundy was not charged with multiple counts of kidnapping was merely the discretion of the State in determining what charges to bring.

**{¶57}** Since none of the above counts are based upon the same conduct and all were conducted with a separate animus, they are not allied offenses of similar import. Thus, they do not merge for the purposes of sentencing. The first assignment of error is overruled.

**{¶58}** Lundy's fourth assignment of error challenges that the sentence was contrary to law because the trial court imposed maximum, consecutive sentences. "A trial court's sentence will not be disturbed on appeal absent a defendant's showing by clear and convincing evidence that the sentence is unsupported by the record; the sentencing statutes' procedure was not followed or there was not a sufficient basis for the imposition of a prison term; or that the sentence is contrary to law." *State v. Rust*, 3d Dist. Marion No. 9-12-49, 2013-Ohio-2151, ¶ 11. A trial court has discretion to impose any sentence within the statutory range. *State v. Saldana*, 3d Dist. Putnam No. 12-12-09, 2013-Ohio-1122, ¶ 20. When imposing a sentence on a felony conviction, the trial court must consider the purposes of sentencing as set forth in R.C. 2929.11, and the sentencing factors set forth in R.C. 2929.12. Additionally, in order to impose consecutive sentences, the trial court must make specific findings on the record as set forth in R.C. 2929.14(C)(4). "Specifically, the trial court must find that (1) consecutive sentences are necessary to either protect the public or punish the offender; (2) the sentences would not be disproportionate to the offense committed; and (3) one of

the factors set forth in R.C. 2929.14(C)(4)(a, b or c) applies." *State v. Peddicord*, 3d Dist. Henry No. 7-12-24, 2013-Ohio-3398, ¶ 33.

{¶59} In this case, Lundy was conviction of four felonies of the first degree. For felonies of the first degree, the prison term shall be between three and eleven years. R.C. 2929.14(A)(1). Before imposing the sentence, the trial court reviewed the record, oral statements, victim impact statements, and the pre-sentence report. The trial court then made the following statements at the sentencing hearing.

> **Now, getting to 2929.12, taking into consideration all of the information here, the Court would find there are factors indicating the defendant's conduct to be more serious than conduct normally constituting the offenses and that is the harm, the physical and psychological harm suffered by the victims. I find in this case that is a factor that weighs heavily because the facts, from the evidence, it was shown, and the photos, for example, that showed. In not all Agg. Burglaries and not all Kidnappings and not all Rapes is there such physical harm caused to the victims. So, I find that it is more serious in this case.**
>
> **I don't find any of the factors indicating the defendant's conduct to be less serious.**
>
> **I find there are factors indicating the defendant is likely to commit future crimes. Perhaps in not the same analysis that the State is arguing in terms of his propensity to commit future crimes such as this, and I understand the argument that his prior record doesn't include any sex offenses, but at the time of committing this offense he was on community control in the 2008 case. That's clear. He does have a prior record. That's clear. I would find that he has not responded favorably to sanctions**

**previously imposed. So, all of those are factors that indicate that he is likely to commit future crimes.**

**The best information I have, however, is he did not have a juvenile record, unless the State found something that the P.S.I. didn't find.**

**\* \* \***

**It just said, 'no known prior record' in the P.S.I. as a juvenile. But, I will make that determination that I don't have any information of a prior adjudication as a delinquent. That is a factor that is under 2929.12(E), a factor indicating the defendant's not likely to commit future crimes.**

**There's no way around the Court's determination that I'm making at this point that these were crimes of violence, obviously, by definition, but also by facts. Again, I'm judging the actions of the defendant in making my determination on sentencing. Short of ending a life, or short of grotesque disfiguration, there's not too many cases that I'll ever confront that would show more violence than this case. Whether a victim is a male or a female, what has happened to the victims in this case, is very, very violent. The circumstances of this case, how it happened, where it happened, weigh heavily on the Court's consideration in this case.**

Sent. Tr. 37-39. The trial court then imposed sentences of eleven years in prison for each of the rape counts and nine years in prison for the aggravated burglary count and the kidnapping count. The trial court in its judgment entry of sentencing specifically stated that it had considered the purposes and principles of sentencing as set forth in R.C. 2929.11. R. 217. The trial court also addressed the statutory factors set forth in R.C. 2929.12. Each of the sentences was within the statutory range for felonies of the first degree and the trial court considered all

applicable factors and the principles of sentencing. Additionally, the record supports the determinations of the trial court as to the factors. Thus, the trial court did not err in imposing the maximum sentences as to the two rape counts.

{¶60} Lundy also challenges the imposition of consecutive sentences in this case. The trial court in this case found as follows.

> **The Court is going to order all four counts to be consecutive to each other because the Court finds that consecutive sentences are necessary to protect the public from future crime and to punish the defendant and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and the danger the offender poses to the public. The Court also finds that the offender committed these offenses while he was on community control in the 2008 case and that the multiple offenses were all committed as part of one or more courses of conduct. I find the harm caused by the offenses was so great and unusual that a single prison term for any of the offenses committed as part of the course of conduct would not adequately reflect the impact on the victim. Consecutive sentences adequately reflect the seriousness of the conduct.**

Sent. Tr. 40. These findings were reflected in the judgment entry of sentencing. R. 217. These findings satisfy the requirements of R.C. 2929.14(C)(4) which must be met for the trial court to impose consecutive sentences. Since the requirements were met, the trial court did not err in ordering the sentences to be served consecutively. The fourth assignment of error is overruled.

{¶61} Finally, Lundy argues that he was denied effective assistance of counsel at trial.

> **In evaluating whether a petitioner has been denied effective assistance of counsel, this court has held that the test is "whether the accused, under all the circumstances, * * * had a fair trial and substantial justice was done."** *State v. Hester* **(1976), 45 Ohio St.2d 71, 74 O.O.2d 156, 341 N.E.2d 304, paragraph four of the syllabus.   When making that determination, a two-step process is usually employed. "First, there must be a determination as to whether there has been a substantial violation of any of defense counsel's essential duties to his client. Next, and analytically separate from the question of whether the defendant's Sixth Amendment rights were violated, there must be a determination as to whether the defense was prejudiced by counsel's ineffectiveness."** *State v. Lytle* **(1976), 48 Ohio St.2d 391, 396–397, 2 O.O.3d 495, 498, 358 N.E.2d 623, 627, vacated on other grounds (1978), 438 U.S. 910, 98 S.Ct. 3135, 57 L.Ed.2d 1154.**
>
> **On the issue of counsel's ineffectiveness, the petitioner has the burden of proof, since in Ohio a properly licensed attorney is presumably competent.  See** *Vaughn v. Maxwell* **(1965), 2 Ohio St .2d 299, 31 O.O.2d 567, 209 N.E.2d 164;** *State v. Jackson***, 64 Ohio St.2d at 110–111, 18 O.O.3d at 351, 413 N.E.2d at 822.**

*State v. Calhoun*, 86 Ohio St.3d 279, 289, 1999–Ohio–102, 714 N .E.2d 905.

{¶62} Lundy argues that his counsel was ineffective for making the following statements.  Lundy claims that counsel basically conceded that the State was telling the truth in their opening statement and cites to the statement.  Taken in context, the alleged error was as follows.

> **Ladies and gentlemen, there's a reason opening statements aren't evidence because nothing's been presented to you.  Let me tell you what I think is gonna come out in this case.**
>
> **About eighty percent of what Ms. Emerick was telling you about uh, [the victim] being attacked uh, about Mr. Hammond being attacked, all that, we're not gonna contest that.  This thing**

> **happened on June twenty-first of 2012, that's not gonna be contested. Okay?**
>
> **The problem that we have, and what I believe the evidence is gonna show is, it's gonna show the two main things. One, this identification of who the assailant was, was flawed; was only done by one person, and is not reliable. In other words, what I believe the evidence is gonna show is that [the victim's] identification of [Lundy] is not reliable enough for anyone to include [sic] that he was the assailant.**

Tr. 198-99. Contrary to what Lundy is arguing, trial counsel did not concede the case to the State. Instead, counsel was arguing that although the victim and Mr. Hammond were attacked, it was not his client who committed the crime. Considering the photos and medical reports concerning the condition of the victim and Mr. Hammond after they were attacked, arguing that they were not attacked would not have been credible. This court has no reason to believe that counsel's statement was not a reasonable trial strategy, and thus was not ineffective representation.

{¶63} Lundy also claims counsel was ineffective by conceding the attack in closing arguments. Again, the statements made by trial counsel, when taken in context show a different perspective.

> **Obviously, in cases where we have lots of evidence, the State is correct, it does have the burden of proof on all elements. I am not gonna sit here and go through every single element with you because as far as the defense is concerned, not every single element is part of our defense.**

**As Miss Emerick said, there's always those questions, you know, what happened, where did it happen, when did it happen, how did it happen, and the who? And essentially she's right as to almost everything that we're talking about in that scenario, there aren't questions of what happened; there's no question in anyone's mind that [the victim] was raped. There's no question that she got chased through her house, uh, that she got dragged down to the river and raped. There is no question of what happened.**

**There's no question of where. We all agree where it happened, we all agree it happened where she was living - - her house and the riverwalk near then (sic). We all agree as to when, on June twenty-first of 2012. And the means by which it happened, it's pretty obvious from the testimony, okay?**

**So all those things, we're not sitting up here and telling you, you know, the State didn't - - maybe they technically didn't say exact time on the twenty-first of July of 2012, or anything like that. So none of those things are really what I consider important for purposes of the defense. They are, because you have to find everything, we understand that, but if [sic] assists you when you're going through those elements when you deliberate, it's much easier if, in my opinion, if you focus on the issues in places where there is real dispute.**

**And that is, the who. Okay? That's the dispute in this case, that's it. What we spent three, three and a half, four days doing is debating the who: not really debating, we've been presenting evidence, now we're debating.**

Tr. 806-807. Again, the theory of the defense throughout the case was that the State had not proven beyond a reasonable doubt who was responsible for the offense. This was a reasonable trial strategy. The testimony of the officers was that Lundy denied involvement. The defendant's version of events as stated in the PSI was that he was in the area on the way to a friend's home, but he denied

committing the crime. At sentencing, Lundy again stated that he was innocent. Given the repeated denial of the defendant as to his involvement, trial counsel's strategy was sound. The record does not indicate that trial counsel was ineffective. The fifth assignment of error is overruled.

{¶64} Having found no prejudicial error in the particulars assigned and argued, the judgment of the Court of Common Pleas of Allen County is affirmed.

*Judgment Affirmed*

**ROGERS and SHAW, J.J., concur in Judgment Only as to Assignment of Error No. 1.**

**/jlr**